**Drew WEBER, Plaintiff**

v.

**Kurt SANBORN, Play Ball Manchester, LLC, Sanborn Associates, The Sanborn Group, Inc., Gerald R. Prunier, Andrew A. Prolman, Thomas J. Leonard III, and Prunier, Leonard & Prolman, P.A., Defendants.**

**Civil Action No. 06–10125–JLA.**

United States District Court, D. Massachusetts.

Nov. 6, 2007.

Joseph H. Reinhardt, Boston, MA, for Plaintiff.

Phillip Rakhunov, Sullivan & Worcester LLP, Boston, MA, Emily G. Rice, Martha Van Oot, Orr & Reno, P.A., Concord, NH, for Defendants.

**CONSOLIDATED ORDER ON**

**PLAINTIFF'S MOTIONS: (1) FOR LEAVE TO AMEND COMPLAINT and (2) FOR PARTIAL SUMMARY JUDGMENT STRIKING AFFIRMATIVE DEFENSES H, I, J, AND N, AND DEFENDANTS' REQUEST FOR ATTORNEY'S FEES** *(Docket # 69, 70)*

**and**

**DEFENDANTS' MOTIONS: (1) TO STRIKE EXPERT OPINION OF ANDREW PERLMAN and (2) FOR SUMMARY JUDGMENT ON COUNTS II AND VIII** *(Docket # 72, 73)*

ALEXANDER, United States Magistrate Judge.

Before this Court are four motions, each of which received significant attention during a hearing held October 16, 2007. For the reasons set forth more fully below, this Court holds that: (1) Plaintiff's Motion for Leave to Amend Complaint is DENIED; (2) Plaintiff's Motion for Partial Summary Judgment Striking Affirmative Defenses H, I, J, and N, and Defendant's Request

for Attorney's Fees is DENIED; (3) Defendant's Motion to Strike the Expert Opinion of Andrew Perlman is DENIED; and (4) Defendant's Motion for Summary Judgment on Count II is GRANTED and on Count VIII is DENIED.

## PROCEDURAL HISTORY

On January 20, 2006, Plaintiff, Drew Weber ("Weber"), filed the initial lawsuit against defendants Kurt Sanborn, Play Ball Manchester, LLC, Sanborn Associates, The Sanborn Group, Inc. (collectively the "Sanborn Defendants"), Gerald R. Prunier, Andrew A. Prolman, Thomas J. Leonard III, and Prunier, Leonard & Prolman, P.A., (collectively "PL & P"). Weber brought claims of Conversion and Breaches of Fiduciary Duty against the Sanborn Defendants and PL & P; claims of Negligent Misrepresentation, Fraud, Participation in a Breach of Trust, Breaches of Express and Implied Contracts, and Violation of Chapter 93A against all defendants; and a claim of professional malpractice against PL & P.

The Sanborn Defendants failed to appear in this matter. Consequently, on June 28, 2006, this Court granted a default judgment in Weber's favor in the amount of $7,749,000 plus costs and interest from the date of filing the Complaint. At that time, Weber also stipulated to dismiss Count III (Fraud) as to PL & P.

Further, because Weber also subsequently stipulated, with prejudice, to the dismissal of Counts I, III, IV, V, and VII, and this Court has dismissed, with prejudice, Count IX of Weber's Complaint, the only remaining claims against PL & P (both the individual lawyers and the firm as an entity) are set forth in Count II (Negligent Misrepresentation) and Count VIII (Legal Malpractice).

## FACTUAL BACKGROUND

In the spring of 2002, Weber became involved in the Riverfront Development Project, a $150 million development project in the city of Manchester, New Hampshire ("City") along the banks of the Merrimack River. It was intended to consist of a Minor League Baseball stadium, retail stores, a hotel, residential condominium properties, a power plant, and attendant parking. Weber's main roles in the project were to: (1) acquire a Minor League Baseball team and relocate it to the City for the 2004 season; (2) work with the City in renovating an existing stadium (Gill Stadium) for temporary use during the first season of play; and (3) oversee construction of a new stadium which the team would begin using in 2005. To further that end, Weber formed the corporation 6 to 4 to 3, LLC ("6–4–3").

The City, which would continue to own the developed property, was to provide primary funding for the renovation of Gill Stadium and construction of the new stadium. The City was to lease the property to Manchester Downtown Visions, LLC ("MDV"), the primary development company for the project. Sanborn was an active member of MDV.

Sanborn is also the sole owner of Sanborn Associates, The Sanborn Group, Play Ball Manchester, LLC, and a member of 6–4–3 (although he never fulfilled the terms that conditioned his financial interest in 6–4–3). Sanborn's financial interest in MDV and his affiliation with both Weber and 6–4–3 created an alleged conflict of interest as Weber contends that Sanborn often advanced the interests of MDV, to the detriment of Weber, in connection with the development project.

On December 11, 2002, PL & P, as Sanborn's attorneys, filed a certificate of formation for 6–4–3 in New Hampshire based on the agreement that Sanborn

would hold a 30% membership interest in the company, in consideration of a capital contribution of $3,000,000. Although PL & P was aware that no capital contribution had been made, it nonetheless caused the issue of the 30% interest and conducted business as though Sanborn had authority to act on behalf of 6–4–3. On December 13, 2002, PL & P agreed to represent Weber, acting through 6–4–3, on all zoning and development issues. Weber alleges that PL & P then represented him personally in a number of transactions. For example, under PL & P's representation, Weber acquired a substantial line of credit in order to front the costs of certain land acquisitions and other soft costs for the entire development project; he claims he did so based only on Sanborn's promises that Weber would be reimbursed for said costs. On July 31, 2003, PL & P executed a written agreement between 6–4–3 (represented by Weber) and MDV (represented by Sanborn as its "manager") to appoint MDV as the construction manager of the Gill Stadium renovations and the construction of the new stadium, at a cost to Weber of $200,000 annually. PL & P, thus, represented both parties to the transaction. Weber alleges that at no time did PL & P discuss any conflicts of interest with him or seek any type of conflict waiver.

Although not part of the original Memorandum of Understanding, the City's legal counsel presented to PL & P drafts of agreements that would impose upon Weber a personal guarantee and a $2.7 million letter of credit as security for the lease of the stadium land, as well as a proposal that Weber be personally responsible for the relocation of Singer Park. Instead of suggesting changes to the documents, PL & P recommended that they be signed as drafted. Additionally, PL & P did not alert Weber that Sanborn had grossly misrepresented the cost of the park's relocation

(originally intended to be split between MDV and 6–4–3).

Weber also alleges that Sanborn embezzled substantial sums of money with the aid of PL & P, who issued checks drawn on the firm's client trust account to nonexistent contractors based on falsified invoices created by Sanborn. Weber claims that PL & P did not alert him that the checks it issued were deposited in Sanborn's accounts, and were either not endorsed or falsely endorsed.

THE MOTIONS

## (1) Plaintiff's Motion For Leave to Amend Complaint

*(Docket # 69)*

■ Immediately following this Court's dismissal of Count IX of Weber's Complaint (Violation of 93A: Massachusetts Unfair and Deceptive Trade Practices Statute), Weber filed the instant Motion for Leave to Amend his Complaint, seeking to add Count X (Violation of NH RSA 358–A: New Hampshire's Unfair and Deceptive Trade Practices Statute).

■ The command of Fed.R.Civ.P. 15(a) that leave to amend "shall be freely given when justice so requires..." is consistent with a broad policy underlying the Federal Rules of Civil Procedure that in most instances disputes should be decided on their merits. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *United States v. Hougham*, 364 U.S. 310, 317, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960). Nevertheless, a court considering a motion to amend should consider the totality of the circumstances and balance the equitable considerations which bear on the motion. Whether the proposed amendment would unfairly prejudice the opposing party, whether the party seeking the amendment has exercised due diligence, and whether the proposed amend-

ment involves futility, unseemly delay, bad faith, or waste of the court's or the parties' resources are all factors which may be considered. *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517 (1st Cir.1989); *Carter v. Supermarkets Gen. Corp.*, 684 F.2d 187, 192 (1st Cir.1982).

Where a considerable period of time has passed between the filing of a complaint and the motion to amend, courts have placed the burden of proof on the movant to show some "valid reason for his neglect and delay." *Carter*, 684 F.2d at 187 (citation omitted). In *Quaker*, the First Circuit identified "relevant indicators [that] point uniformly toward disallowance," such as whether the facts upon which the motion to amend is based were known to the party throughout, whether a great deal of discovery had already taken place before the motion was filed, and whether the moving party proffered a satisfactory explanation for its delay. *Quaker*, 884 F.2d at 1518 (denying defendant's motion to amend where he was unable to offer a reason for his delay, virtually all discovery was complete, and facts upon which the motion rested were known to the defendant throughout).

As to a futility argument, both parties debate whether Weber's amendment properly relates back, and whether it would, nonetheless, be barred by NH RSA 358–A's statute of limitations. This Court finds, however, that regardless of whether Weber's claim relates back to the original transaction or occurrence, or is subject to a statute of limitations preclusion, his argument fails. In *Zee-Bar, Inc. v. Kaplan*, 162 F.R.D. 422, 427 (D.N.H.1993), the court held that although plaintiff's motion for leave to amend a negligence complaint

under a New Hampshire statute was based on application of a different legal theory to the original set of facts, it nevertheless satisfied the relation back provision of Rule 15(c)(2). However, upon balancing the equities, the court denied the motion in light of plaintiff's failure to offer a valid reason for his excessive delay and prejudice to defendant, where discovery was already closed. *Id.*

Similarly, in *Quaker*, the Magistrate Judge's allowance of a late motion for leave to amend was vacated upon review by a District Judge, when the moving party failed to proffer a satisfactory explanation for its delay, and only two months remained in an already extended discovery period. The First Circuit affirmed this decision, noting that the relevant factors tipped the scales so heavily that the District Court was within its proper domain in deciding that the Magistrate Judge should not have allowed the amendment. *Quaker*, 884 F.2d at 1518. *See also Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15, 19–20 (1st Cir.1979) (two-year delay sufficient to support denial of amendment where movant has not carried the burden of explaining delay).

In the instant case, Weber attempts to attribute his delay in filing the motion for leave to amend to PL & P's belated motion for judgment on the pleadings as to Count IX. While it is true that PL & P did not move for judgment on the pleadings until well after the September 1, 2006 deadline imposed by this Court, PL & P previously prevailed with its contention that it did file the motion for judgment on the pleadings promptly, upon conclusion of factual discovery, when it became evident that none of the challenged actions took place in Massachusetts.[1] Thus, PL & P's delay can

---

1. This Court addressed this issue in allowing the motion in its Order of August 22, 2007

*(Docket # 68 )*, 502 F.Supp.2d 197.

be attributed to the discovery process. Weber's assertion that his delay can be attributed to his opponent's filing schedule is a non-starter, as is his unique proposal during oral argument that this Court's workload and "typical" turn-around time for decisions would provide sufficient time for PL & P to provide additional discovery.

No new evidence has come to light that would justify Weber's delay. In fact, Weber's memorandum in support of his motion for leave to amend the Complaint indicates that his counsel was aware of the possibility that the 93A claim would be dismissed. Likewise, at the July 17, 2007 status conference, Weber's counsel told the Court that if the claim was dismissed, he would seek leave to amend the Complaint. Rather than explaining Weber's delay, the above facts point to Weber's failure to amend his Complaint earlier in the proceedings, though he had knowledge that there were serious problems with the 93A claim and that it might be dismissed.

Simply put, Weber does not offer any substantive reason for his delay in bringing a claim against PL & P under the New Hampshire statute. He does not assert new factual allegations in the proposed amendment, but rather revises his conclusion that the alleged commission of unfair and deceptive acts occurred in New Hampshire, rather than Massachusetts. Weber, ironically, relies heavily on *Colmenares,* where appellants' motion to amend was properly *denied* because the moving party did not point to any change in circumstances or additional evidence that would merit the delay additional discovery would inevitably cause. *Colmenares Vivas, et al. v. Sun Alliance Ins. Co., et al.,* 807 F.2d 1102, 1108 (1st Cir.1986). In *Colmenares,* the defendant had prepared its case on the basis of a contractual indemnity complaint, not the direct liability claim the plaintiff was seeking to add through amendment.

*Id.* The court held that the inevitable delay caused by additional discovery would be warranted if additional evidence had come to light, but since appellants did not point to any such change in circumstances, the District Court did not err in denying appellant's motion to amend the complaint. *Id.*

The particular facts of each case determine whether undue delay is sufficiently prejudicial to the opposing party to warrant a denial of leave to amend. Here, whether Weber's delay would prejudice PL & P enough to justify denial turns in part on whether additional discovery is needed under the New Hampshire statutory claim, or whether granting the motion to amend would delay the trial or further burden the Court's and the opposing parties' resources. At the hearing held on October 16, 2007, PL & P averred that additional discovery would be needed to properly prepare for a new claim under New Hampshire law.

As noted above, the Massachusetts and New Hampshire Consumer Protection statutes are nearly identical, and New Hampshire courts have looked to Massachusetts case law for guidance when interpreting the New Hampshire statute. In *WVG,* the New Hampshire court noted that even though the case before it was one of first impression, the Massachusetts consumer protection statute was "very similar to that of New Hampshire," and contained exactly the same definition of trade and commerce as RSA 358–A, as well as the same exemption as Massachusetts (barring claims based on events occurring more than three years prior). *WVG v. Pac. Ins. Co.,* 707 F.Supp. 70, 73 (D.N.H.1986); *see also Remsburg v. Docusearch, Inc.,* 149 N.H. 148, 160, 816 A.2d 1001 (2003) (noting similarity between Massachusetts and New Hampshire Consumer Protection Acts).

The liberal allowance of amendments to pleadings is important to assure a party a fair opportunity to present claims and defenses. However, equal attention should be given to the proposition that litigation must end. While the First Circuit has held that a moving party's failure to justify undue delay, when the facts upon which the proposed amendment are known throughout, provides sufficient grounds for denial of leave to amend, these cases generally involve the prospect of additional discovery or other significant burden on the non-moving party. *Colmenares,* 807 F.2d at 1108 (amendment would have necessitated postponement of the trial while defendant conducted additional discovery); *Quaker,* 884 F.2d at 1518 (denying motion to amend based on the prejudice to defendant, because discovery was completed before plaintiff's new legal theory, and absent justification for plaintiff's delay); *Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47 (1st Cir.1998) (denying defendant leave to amend where motion was made two years after original counterclaims were filed, facts upon which the proposed counterclaim rested were known to defendant all along, most of the discovery had taken place, and defendant never proffered a satisfactory explanation for its delay); *Carter,* 684 F.2d at 192 (where a considerable amount of time has passed between the filing of the complaint and the motion to amend, the burden is on the moving party to show valid reason for delay; "clerical error" excuse did not justify a six year delay).

No bright-line mechanical test has emerged from other circuits, but generally, the longer a party delays in bringing an amendment, the less prejudice an opposing party must show to justify denying leave to amend. *See UNR Ind., Inc. v. Continental Ins. Co.,* 682 F.Supp. 1434 (N.D.Ill.

1988) (fifteen months after commencement of litigation, plaintiff's inexcusable delay and prejudice to defendant outweighed plaintiff's right to have its RICO claim heard); *Avatar Exploration, Inc. v. Chevron, USA, Inc.,* 933 F.2d 314 (5th Cir.1991) (District Court's denial of leave to amend was proper where the court's deadline for filing amendments was past, and the amendment would have been futile); *Fin. Holding Corp. v. Garnac Grain Co.,* 127 F.R.D. 165 (W.D.Mo.1989) (where reason for seeking amendment to the pleadings following the scheduling order deadline was apparent before the deadline, and no offsetting factors appear, the deadline must govern); *Layfield v. Bill Heard Chevrolet Co.,* 607 F.2d 1097 (5th Cir.1979) (District Court properly denied amendment that was tendered after summary judgment motion was filed, when all facts were known at the time original complaint was filed); *see also Woodson v. Fulton,* 614 F.2d 940, 943 (4th Cir.1980) (holding that denial of leave to amend was proper where Woodson's attorney had known of a possible First Amendment claim for some time but waited until after defendant had filed for summary judgment to move for amendment).

Because Weber cannot articulate a valid reason for his prejudicial delay in bringing this claim under New Hampshire law, and because additional discovery would be necessary for PL & P to fairly litigate this claim, Plaintiff's Motion for Leave to Amend Complaint at this late date is DENIED.

*(2) Plaintiff's Motion For Partial Summary Judgment to Strike Affirmative Defenses H, I, J, and N And Defendant's Request For Attorney's Fees*

*(Docket # 70)*

"Summary Judgment is appropriate only when 'there is no issue of genuine material fact,' Fed.R.Civ.P. 56(c), and the court

must look at the record in the light most favorable to the party opposing the motion, indulging all inferences in that party's favor." *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 197–98 (1st Cir.1983) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975)).

When considering whether to grant summary judgment, a court must determine whether:

> The pleadings, depositions, interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P 56(c).

In making this assessment, the court must "accept all reasonable inferences favorable to the nonmovant." *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 205 (1st Cir.1996) (collecting cases); *see also Lawton v. State Mut. Life Assurance Co. of Am.*, 101 F.3d 218, 222–23 (1st Cir.1996) (same).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To decide whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.; Hahn*, 523 F.2d at 464; *see also Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731 (1st Cir.1995); *Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 25 (1st Cir.1997). In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."

*Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Vinick v. Comm'r of Internal Rev.*, 110 F.3d 168, 171 (1st Cir.1997). Essentially, this rule of law directs the definition of which facts are material to the substantive governing law of the particular circumstances. *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (citing *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505).

Rule 56 does not, however, permit the party opposed to a summary judgment motion to rest upon the mere allegations or denials of its own pleadings. *See Int'l Ass'n of Machinists & Aerospace Workers*, 103 F.3d at 205 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992)) ("The core purpose of the summary judgment procedure is to 'pierce the boilerplate of the pleadings' and evaluate the proof to determine whether a trial will serve any useful purpose."). Rather, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Potterton v. Porter*, 810 F.2d 333, 334 (1st Cir.1987).

█ Regarding Affirmative Defense H, that Weber's losses, if any, were caused by the acts and omissions of a third party over which PL & P had no control, PL & P point to Weber's own deposition, as well as the depositions of Richard Billings, Frank Catapano, and Andrea Batchelder. They cite to specific instances in which Weber held Sanborn out to be his partner; authorized the alleged fraudulent invoices submitted by Sanborn; negotiated through Batchelder, a separate attorney, to get

Sanborn "out of baseball" after disagreements arose; admitted that his own investigation turned up the fact that the fictitious entities "led back to Mr. Sanborn" as well as Billings' testimony that he gave Weber legal and accounting advice independent of PL & P, to help Weber "keep attorney costs down." PL & P also denies that it represented Weber individually, and notes evidence that the corporation Weber refers to in his Factual Background of the Complaint in which he "held a significant equity interest" is not a party to this action. In short, the specific facts to which PL & P can point raise a dispute of material fact as to an essential element of its affirmative defense; that is, there is a question for the finder of fact over whether Weber's losses, if any, were caused by a third party or parties over which PL & P had no control. Accordingly, summary judgment is DENIED as to Affirmative Defense H.

■ In support of Affirmative Defense I, that Weber assumed the risk of the Riverfront Development Project, PL & P notes Weber's admission to the Lowell Sun that he had made a "four-error mistake" in getting involved in the Riverfront Development Project, as well as Weber's admission that he routinely executed documents without reading them. PL & P offers defendant Prolman's deposition, in which Prolman stated that he could not point to any specific instances in which it was clear that Weber assumed the risk of the project, but that it was just Weber's "involvement with the 6 to 4 to 3 transaction with the city." Consequently, PL & P claims that it had no actual knowledge of all the facts surrounding the defenses precisely because of its limited involvement in Weber's and/or 6 to 4 to 3's negotiations with the City, or with any of Weber's other advisors. This of course runs contrary to the facts presented by Weber, creating a

material dispute. Accordingly, plaintiff's Motion for Summary Judgment to Strike Affirmative Defense I is DENIED.

■ Regarding Affirmative Defense J, that Weber's negligence exceeded the negligence, if any, of PL & P, PL & P points to Weber's deposition, where he admitted that he did not read any legal documents put in front of him, including the original Memorandum of Understanding. PL & P asserts that this alone likely entitles it to an instruction on comparative negligence. *Lawrence Savings Bank v. Levenson*, 59 Mass.App.Ct. 699, 797 N.E.2d 485 (Mass.App.2003) *citing Clark v. Rowe*, 428 Mass. 339, 341–45, 701 N.E.2d 624 (1998) (comparative negligence applies to a claim of legal malpractice); *see also Drown v. Hebert*, 340 B.R. 428, 442 (Bkrtcy.D.Mass.2006) (builder's negligence exceeded that of debtor in connection with development where he "was aware of the risks … and chose to proceed with the risks; [his] damages were caused more by his own negligence … not Drown's misrepresentation"). As noted above, this line of argument also goes toward Affirmative Defense I (Weber assumed the risk of investing in the Riverfront Development Project). While a jury instruction is a question for another day, Weber's admission is certainly sufficient to demonstrate a dispute over a material fact relevant to an issue of the claim. Recall that to survive summary judgment, PL & P need not produce sufficient evidence to prevail, but only to raise a dispute that justifies proceeding on the merits. Accordingly, Weber's Motion to Strike Affirmative Defense J is DENIED.

■ Regarding Affirmative Defense N, that Weber's Complaint is barred in whole or in part by the doctrine of superceding intervening causes, many of the same factual allegations as those applicable to Affirmative Defense H (damages caused by a

third party) and J (Weber's negligence exceeded any negligence by PL & P) demonstrate a material dispute of facts. Like the above defenses, PL & P asserts that it does not possess sufficient information to determine the exact causal relationship between Weber's damages, PL & P, and various third parties. The above arguments regarding the potential for third party liability, as well as PL & P's averment that it cannot be held responsible for Weber's actions outside of PL & P's representation, warrant survival of summary judgment. Specifically, depositions of Weber, Billings, Catapano, and Batchelder establish Weber holding Sanborn out as his partner, and Weber's authorization of the allegedly fraudulent invoices. Additionally, the evidence contains specific accounts of Weber employing other attorneys on issues involving the Riverfront Development Project, consultation by friends on legal matters so that Weber could "keep attorney's costs down," and Weber's own admission that he did not read any of the legal documents he signed.

As will be seen, this Court finds that there are material issues of fact that allow the legal malpractice claim to proceed. Those issues reveal the material dispute as to Affirmative Defense N as well. Accordingly, Weber's motion is DENIED.

Finally, regarding Weber's motion for attorney's fees, all parties conceded at oral argument that a discussion of attorney's fees is not yet ripe. Accordingly, the motion is DENIED.

### (3) Defendants' Motion to Strike Expert Opinion of Andrew Perlman

(Docket # 72)

■ PL & P moves to strike the expert opinion of Andrew Perlman, on various grounds. First, PL & P challenges Perlman's qualifications as an expert witness. PL & P avers that the focus of Perlman's teaching and publications is unrelated (professional responsibility and civil procedure rather than legal malpractice) and that he is inexperienced as an expert witness (this is Perlman's first employment as an expert witness). PL & P's position is unreasonably restrictive.

■ Absent exceptional circumstances, it is well established under New Hampshire law that expert testimony is necessary to inform the jury regarding the skill and care ordinarily exercised by lawyers, to prove a breach thereof, and to prove proximate causation in a legal malpractice action. Wong v. Ekberg, 148 N.H. 369, 374, 807 A.2d 1266 (2002); Furbush v. McKittrick, 149 N.H. 426, 432, 821 A.2d 1126 (2003); Carbone v. Tierney, 151 N.H. 521, 528, 864 A.2d 308 (2004). This is not one of those exceptional cases where the facts fit the elements so obviously that expert testimony is not required. As evidenced by the dispute in opinion between Perlman and PL & P's expert, Daniel Sklar, the facts of this case are sufficiently complicated to require expert testimony.

■ Federal Rule of Evidence 702 expresses five bases for qualifying an expert: "knowledge, skill, experience, training, or education." Even if "experience" were to be narrowly interpreted as prior experience in serving as an expert witness, the fact that this is Perlman's first employment as an expert witness does not render him unqualified. Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co., 958 F.2d 1169, 1175 (1st Cir.1992). In the language of FRE 702, the disjunctive conjunction suggests legislative intent to qualify an expert through any of the five bases listed. Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167, 176 (5th Cir.1990). While PL & P challenges Perlman's experience, the four remaining bases are uncontested. Perlman's background in teaching, scholarship,

and professional associations qualify him as an expert on the bases of knowledge, skill, training, or education.

■ "It is well-settled that 'trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses.'" *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir.2000) (quoting *Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 20 (1st Cir.1992)). Implicitly included within Perlman's scholarship of legal ethics is legal malpractice. A lawyer's obligations to clients regarding trust accounts is covered by Perlman in one of the courses he teaches at Suffolk Law School. Based on his credentials, specifically his teaching experience, Perlman is qualified to offer an expert opinion about: (1) whether an attorney-client relationship existed between Weber and PL & P; (2) whether PL & P engaged in conduct that failed to conform with the governing Rules of Professional Conduct and fell below the standard of care of the average and ordinary qualified practitioner; and (3) whether this conduct proximately caused damages to Weber.

■ PL & P further attacks the expert opinion, contending that the principles of substantive law employed by Perlman are improper. Specifically, PL & P objects to Perlman's use of the Rules of Professional Conduct from New Hampshire and Massachusetts ("the Rules"). PL & P argues that the Preamble to the Rules from both New Hampshire and Massachusetts state that legal rules or principles of substantive law external to the Rules determine whether a client-lawyer relationship exists. Though Perlman referred to the Rules, his conclusion was further supported by an American Bar Association Formal Opinion and the Restatement (Third) of the Law Governing Lawyers.

Perlman's use of the Rules was as a threshold affirmation that dual representation is ethically permissible. Rule 1.13(e) expressly states that a lawyer representing an entity "may also represent any of its directors, officers, employees, members, shareholders, or other constituents." N.H. R. Prof. Conduct 1.13(e); Mass. R. Prof. Conduct 1.13(e). To explain *when* such dual representation exists, Perlman relied on principles of substantive law external to the Rules, namely, the ABA Formal Opinion and the Restatement (Third) of the Law Governing Lawyers.

Perlman employed proper legal principles in conducting his analysis. Any further concerns PL & P may have with Perlman's methods or conclusions may more appropriately be dealt with on cross-examination. Accordingly, PL & P's Motion to Strike Expert Opinion of Andrew Perlman is DENIED.

***(4) Defendants' Motion For Partial Summary Judgment on Counts II and VIII***

*(Docket # 73)*

*Count II—Negligent Misrepresentation*

■ Weber began this action by alleging that the PL & P defendants each "made statements of fact to Weber which each, in the exercise of reasonable care, should have known were false and untrue." Complaint at 79. Weber's Complaint also avers his reasonable reliance on PL & P's false statements. *Id.* However, Weber was unable, in either his answers to interrogatories or deposition testimony, to recall any specific false statements made to him by PL & P. *See* Weber Dep. Vol. II, 239–40; Weber Answer to Interrogatory No. 6. Accordingly, PL & P filed a motion for partial summary judgment, dismissing the claim.

■ "The essential elements of negligent misrepresentation are a negligent misrepresentation by the defendant of a

material fact and justifiable reliance by the plaintiff." *Ingaharro v. Blanchette,* 122 N.H. 54, 57, 440 A.2d 445 (1982); *see also Snierson v. Scruton,* 145 N.H. 73, 78, 761 A.2d 1046 (2000) (same). More precisely, the Restatement (Second) of Torts describes negligent misrepresentation:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Restat. 2d. Torts,* § 552. Typically, analysis of negligent misrepresentation claims focuses on whether the false statement was of a material fact, and whether there was reasonable reliance on the part of the plaintiff. In the absence of a false statement, plaintiffs can seldom succeed on a claim of negligent misrepresentation. *See Ingaharro,* 122 N.H. at 57, 440 A.2d 445 (adopting defendant's argument that mere omission could not constitute a negligent misrepresentation in this case). In light of Weber's inability to recall any false statements made to him by PL & P, PL & P seeks partial summary judgment on the negligent misrepresentation count. In response, Weber revised his theory, creating a hybrid fraud/legal malpractice argument while maintaining the appellation of negligent misrepresentation.

In support of his new theory, Weber cites to the court's dicta in *Ingaharro* as evidence that PL & P's mere silence, coupled with the alleged attorney-client relationship, gave rise to his negligent misrepresentation claim. However, *Ingaharro* offers little assistance to Weber's argument, as it involves concealed defects during the sale of real property and ultimately rejects the plaintiff's argument that, at least in New Hampshire, a negligent omission may constitute negligent misrepresentation in such a case. *Id.* at 57–58, 440 A.2d 445; *see also Adams v. Hyannis Harborview, Inc.,* 838 F.Supp. 676, 694 (D.Mass.1993) ("nondisclosure by itself generally will not support a cause of action for negligent misrepresentation"). Weber's reliance on *Stolzoff v. Waste Systems International, Inc.,* 58 Mass.App.Ct. 747, 792 N.E.2d 1031 (2003), is equally flawed. In *Stolzoff,* the court's discussion of negligent misrepresentation took place in the context of claims under the Uniform Securities Act. *Id.* at 765–66, 792 N.E.2d 1031. Crucial to that analysis was the statutory provision that imposed liability where "the defendant made a material misstatement and/*or* omission." M.G.L. c. 110A § 410(a)(2) (emphasis added).[2] No such statutory language exists for the instant claim.

In the case at bar, Weber has not established the existence of either a negligent false statement, a partial false statement which might make future omissions unlawful, or a statutory provision imposing liability for the alleged negligent omissions. Considering the facts of this case, though the existence of a fiduciary duty might bolster Weber's claims under a theory of fraud or legal malpractice, this Court is unable to find support for his current theory of negligent misrepresentation.[3]

---

**2.** Weber also offers *Benoit v. Perkins,* 79 N.H. 11, 104 A. 254 (1918), as his third, and final, supporting case for negligent misrepresentation. However, *Benoit* involved a claim of fraud, with evidence of intentional deceit, and is of no assistance here—all fraud claims, importantly, having already been dismissed.

**3.** Aware of the flaws in Weber's supporting case law, the Court pressed counsel for addi-

██ Additionally, despite Weber's attempts to recast the disputed facts as negligent misrepresentation based upon an omission, the timing of this new strategy raises further concern. Weber waited until now, in the face of PL & P's motion for partial summary judgment, to switch from alleging a false material statement on the part of PL & P, to alleging a negligent omission, coupled with a duty to disclose. Allowing Weber to employ such a last minute tactic would be unfair and will not be countenanced. *See Wells v. Monarch Capital Corp.*, Civ. No. 91–10575, 1996 WL 728125, at *9 (D.Mass. Oct. 22, 1996) (refusing to allow plaintiff to change the basis of its claims after defendant moved for summary judgment) (collecting cases).

As Weber is unable to raise any disputed issue of material fact related to a false or untrue *statement,* made by PL & P, which he reasonably relied upon, and in light of the last minute attempt to switch his theory of the case, PL & P's motion for partial summary judgment is GRANTED as to Count II—Negligent Misrepresentation.

*Count VIII—Legal Malpractice*

██ In bringing a legal malpractice claim, Weber must prove "(i) an attorney-client relationship, which by law imposes a duty on the attorney to 'exercise care, skill and knowledge in providing legal services to the client;' (ii) breach of such duty; and a 'connection of legally recognized causation between the breach and the resulting harm to the client.'" *In Re R & R Assoc. of Hampton*, 402 F.3d 257, 265 (1st Cir. 2005), citing *Draper v. Brennan*, 142 N.H. 780, 782, 713 A.2d 373 (1998). In its motion for partial summary judgment, PL & P avers that Weber (1) cannot establish the existence of an attorney-client relation-

ship between he and PL & P; (2) cannot demonstrate that PL & P breached any duty it owed to him; and (3) cannot prove that any damage he suffered was the result of PL & P's alleged breach.

Despite PL & P's assertions that there are no issues of disputed material fact related to this count, plaintiff and his expert disagree. PL & P draws the attention of this Court to *McCabe v. Arcidy*, 138 N.H. 20, 635 A.2d 446 (1993), to support its argument that, when a lawyer represents a corporation, he does not represent its officers or shareholders absent an express agreement. *Id.* at 25, 635 A.2d 446. Yet the relationship between the plaintiff and attorney in *McCabe* was vastly different than the relationship in the case at bar. In *McCabe*, the plaintiff was merely paying for the legal services of another and the lawyer, having minimal contact with the plaintiff altogether, had informed the plaintiff at the onset that there was no attorney-client relationship. Here, there is a dispute regarding the extent to which PL & P assisted Weber with personal financial matters and, by implication, provided him with legal representation on which he reasonably relied. There is, thus, a dispute over whether PL & P did perform these duties in this capacity and whether that created an attorney-client relationship. Considering the disputed facts and expert testimony, it cannot be said, at this stage, that PL & P is "entitled to judgment as a matter of law." *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505. Accordingly, PL & P's motion for partial summary judgment is DENIED as to Count VIII—Legal Malpractice.

CONCLUSION

For the reasons detailed above, this Court holds that: (1) Plaintiff's Motion for

tional support during oral argument. In response, the Court received a recitation of the

previously filed brief and no more.

Leave to Amend Complaint is DENIED; (2) Plaintiff's Motion for Partial Summary Judgment Striking Affirmative Defenses H, I, J, and N, and Defendant's Request for Attorney's Fees is DENIED; (3) Defendant's Motion to Strike the Expert Opinion of Andrew Perlman is DENIED; and (4) Defendant's Motion for Summary Judgment on Count II is GRANTED and on Count VIII is DENIED.

SO ORDERED.